Freedman, J.
—This is a motion to continue a preliminary injunction restraining the Western Union Telegraph Co., its directors, etc., from making, or taking any steps to make an agreement for the acquirement by lease of the lines of the Mutual Union Telegraph Co. and restraining all the defendants from consummating any such lease, etc.
The action is brought by the plaintiff in his right as a shareholder of the Western Union Co., and its object and purpose is to permanently restrain the making or the consummation of any such lease.
On the motion it was made to appear by affidavits read on behalf of the defendants, that before the order containing the preliminary injunction was served, the agreement had been entered into, the lease executed and delivered, and the Western Union Co. put in possession of most if not all, the lines, and that about the only thing of substance remaining to be done towards full completion, is for the Western Union Co. to pay the consideration. For the purpose of the motion I must assume that that is the true situation.
The question then is whether the plaintiff, as an aggrieved shareholder of the Western Union Co., has shown any ground upon which a court of equity can restrain the final consummation of the transaction.
It is argued thatinasmuch as the purpose of the lease is to create and maintain a monopoly of telegraphic business, the lease is contrary to public policy. If this question was. to be determined upon the general principles of philosophy or the rules of the common law, there would be great force *444 in the argument. Bnt it is for the law-making power of a state to define what public policy upon a given point shall be, and, as shown by me in Williams v. The Western Union Telegraph Co., the legislature of the state of New York has done so in unmistakable language in respect to telegraph companies.. Power was given to every such company to increase its capital to any desired extent upon a compliance with certain formalities and conditions, and chapter 568 of the Laws of 1870 expressly provides that, in order to perfect and extend the connections of telegraph companies in this state, and promote their union with the telegraph system of other states, any telegraph company organized under1 the laws of this state, may lease, sell or convey its property, rights, privileges and franchises, or any interest therein, or any part thereof, to any telegraph company organized under or created by the laws of this or any other state, and may acquire by lease, purchase or conveyance, the property, rights, privileges and franchises, or any interest therein, or any part thereof, of any telegraph' company organized under or created by the laws of this or any other state, and may make payments therefor in its own stock, money or property, or receive payment therefor in the stock, money or property of the corporation, to which the same may be so sold, leased or conveyed, etc., etc.
This statute has been heretofore construed by Judges Barrett and Van Brunt of the supreme court, who, in well considered opinions came to the conclusion that the powers thereby granted were so comprehensive, and given in such clear and unmistakable language, that it is difficult to imagine what arrangements two telegraph companies could make in reference to the conduct of their business which would not come within the protection of the act. It was held that it was the intention of the legislature to give to telegraph companies the power to make any and ah arrangements for the conduct of their business, either jointly or separately, which natural persons could possibly enter into, provided the consent of the directors and the stockholders of every such corporation shall be obtained and ex *445 pressed in a certain way. Upon careful consideration and due reflection 1 could find no reason for differing from the views expressed by the two learned judges referred to.
I must, therefore, hold that under the act of 1870, the Western Union Co. possesses power to lease the lines in question.
The next question then is, whether the lease, as made, calls for the interposition of the court. It was made by the Mutual Union Co. as lessor, to the Western Union Co. as lessee. By its terms the lessor grants and leases to the lessee all and singular the telegraph lines owned by the lessor in the United States, wherever the same may be located, together with all appurtenances, and including also all patent rights and interests in patent rights belonging to or held or controlled by said lessor, and all rights, easements and franchises of every description whatsoever appertaining thereto, saving and excepting only the charter and corporate franchises of .the lessor, except so far as may be necessary or convenient for the use and operation of the lines and property leased. The lease is for the term of 99 years, and thereafter for such further term as will make the full term of 999 years, provided the same may be lawfully done under any renewal or extension of the charter of the lessor, or under the charter of any company succeeding to the lessor’s franchises, or under the individual ownership of the capital stock of the lessor. It then further provides as follows, viz:
“ It is, however, expressly understood and agreed that nothing herein shall be construed as intended or effective, to pass any title to, or interest in, any property of the lessor, except so far as by the constitution or laws of any State in which the said property is situate it may be lawful to transfer the same, but any property or interest which by reason of such laws or constitution may not lawfully pass to the lessee, shall be and remain the property of the lessor and under its exclusive control as completely in all respects as if this instrument had not been executed, but every ■ such property and interest, upon demand of the lessee, *446 shall by the lessor, its successors or assigns, be conveyed or transferred under any agreement permitted by the said constitution or laws, and the consideration therefor shall enure and belong to the lessee, but subject to be returned or accounted for to the lessor without interest or rental, otherwise than is herein provided for, upon the termination of this lease for any cause. “ This provision shall apply with like force to any property or interest which would otherwise be liable to forfeiture under any contract made by the lessor.
“It is further agreed by and between the parties hereto, that in the event of a threatened termination, by limitation, of the present charter or incorporation of either or both parties hereto, during the term of this lease, proper steps shall be taken, in advance thereof, to procure an extension or renewal of the said charter or charters, or a re-incorporation of either-or both of said parties, so as to cover the full term hereby created, and in such case the provisions hereof shall apply fully and in all respects to any such extension, renewal or re-incorporation.
“ And in consideration of the premises, the lessee hereby covenants and agrees for itself, its successors and assigns, to pay during each and every year of the term hereby created, the rents following, to wit:
“First. The sum of three hundred thousand dollars per annum, payable semi-annually, on the first days of May and November, being interest at six per centum per annum, from the fifteenth day of February, one thousand eight - hundred and eighty-three, upon the mortgage bonds of the lessor, to the amount of five millions of dollars, which said interest shall be paid directly to the holders of said bonds at the time and place or places covenanted therein, and in all respects as required by the tenor of said bonds, until the same shall be fully paid and discharged.
“Second. On the first day of May in each and every year, after the year eighteen hundred and eighty-five, the full sum of fifty thousand dollars, to be applied as a sinking fund for the redemption of said bonds, which sum *447 shall be paid to the Central Trust Company, of New York, as trustee, or his successors in the trust created by an indenture made on the twenty-second day of May, eighteen hundred and eighty-two, by and between the lessor and the said Central Trust Company and the lessee shall assume and pay said bonds as and when they may become due, and all sums which in the meantime become due for interest and sinking fund, except interest accrued prior to the fifteenth day of February, one thousand eight hundred and eighty-three ; but the lessee shall not be liable to pay the-portion of the rent above stipulated, except as may be required for such payments, nor after said bonds have been paid. Provided-, that at or before the maturity of said bonds, the lessee may agree with the holders thereof for any extension or renewal thereof, or may demand and receive from the lessor new bonds of no greater amount than may then be outstanding of the bonds above mentioned, and bearing no higher rate of interest, to be used in substitution therefor. And in that case all payment s required by said substituted bonds, whether for principal, interest or sinking fund, shall be made by the lessee. The lessee covenants that it will, at the request of the holders of said now outstanding bonds, or any of them, endorse thereon in proper terms its covenant to pay the interest and principal thereof.
“Third. The further sum of one hundred and fifty thousand dollars per annum payable semi-annually, on the first days of January and July in each year during the continuance of this lease ; the said sum of one hundred and fifty thousand dollars to be paid to the lessor or its successor company until the first day of January, one thousand eight hundred and eighty-five, and thereafter to the stockholders of the lessor or its successor company, semi-annually, on such. days, pro rata according to their respective-holdings of such stock, and the lessee covenants that on and after the first day of January, one thousand eight hundred and eighty-five, or sooner, if the lessor or its successor shall so elect, and if the liabilities which the lessor herein cove *448 nants to meet and existing controversies as to the amount of capital which the lessor can lawfully put forth have been adjusted to the satisfaction of the lessee, then at the request of tire stockholders or any of them of the said lessor or its successor company, the lessee will endorse in proper terms on the certificates of stock of the lessor or its successor company, and each of the said certificates respectively, its covenant to pay directly to said stockholders pro rata, the said sum of one hundred and fifty thousand dollars aforesaid ; reserving, however, to the lessor and its successor corporation, the right to bring suit in its own name for or upon any default of the lessee in making any payment at the time specified herein.’ ’
The lease contains numerous other provisions which it is not necessary to mention here.
The plaintiff insists that the lease is void under the constitution and the laws of Pennsylvania, and the laws of two other states. Only the constitution and the laws of Pennsylvania were laid before me, and from them it does appear that the consolidation of telegraph companies is not lawful in that state. But the constitution and the statutes of a state can have no extraterritorial effect, and hence it is a grave question whether they can be enforced against companies organized under and in pursuance of the laws of any other state and having power to consolidate at home. That there may be some difficulty, seems to have occurred to the contracting parties, for they sought to overcome it by an express provision of the lease to which I have referred. W liether in this way the difficulty has really been overcome, it is not necessary to determine. Por the contracting parties concluded the bargain with the constitution and the laws of Pennsylvania and of the several states of the United States in plain view, and with reference to them, and hence, any difficulty that may hereafter arise from any such source, would at most only impair the consideration to be paid by the Western Union Co. But a partial failure of consideration which was contemplated by the parties as likely or possible to occur and *449 ■with reference to which the bargain was closed, does not justify a court to interfere.
It therefore remains to be seen whether there was anything in the manner in which, and the circumstances under which, the lease was entered into, which gives to the plaintiff a standing in .court. He complains, among other things : (1.) That about two years.ago the Western Union Co. illegally consolidated with the Atlantic and Pacific Telegraph Co. and the American Union Telegraph Co.; that in consequence thereof the capital stock of the Western Union was illegally increased from about 40 to 80 millions of dollars; and that such consolidation and increase of stock have been adjudged illegal; and (2.) That there were illegalities in the issue of the stock and the bonds of the Mutual Union Co. referred to in the lease, in consequence of which proceedings were commenced by the attorney general to vacate the charter of the Mutual Union Co.
Upon these points the papers submitted on both sides present a sharp conflict of evidence. Much, if not most, of plaintiff’s case is made up of mere conclusions. The affidavits on the part of the defendants negative every' averment, of the complaint and the moving affidavits which has any appearance of materiality. Of these two points, therefore, It may be said that all the equities claimed by the plaintiff. have been fully met.
But beyond that, it is not true that the courts have; denied the power of the Western Union Co. to consolidate; with the two companies named or to increase its stock to 80 millions. The'decision made only went so far as to adjudge that the scheme involved in that consolidation of gratuitously distributing among the shareholders of the Western Union about 15 millions of stock, was illegal and. rendered the particular agreement for consolidation null and. void. If those 1-5 millions of stock have been illegally distributed, the statute gives a remedy to the corporation, against the directors who caused it to be done. Moreover it is not even pretended that the lease now complained of; *450 in any way grew out of, or has any relation to, the said consolidation.
So in respect to the alleged illegality of the stock and. the bonds of the Mutual Union Co., it may be saiff that, even if the charge were true, it would be immaterial. They merely furnish the measure for the agreed rental, and it-can make no difference to the Western Union Co., or-to its stockholders, whether this rental is paid to the Mutual • Union Co. or to the holders of its bonds or its stock. Concerning the said bonds it may be further said that the Western Union Co. cannot dispute their validity any more than it could dispute the validity of a bond and mortgage for usury after it bought the mortgaged premises and assumed to pay the mortgage. This being so, the stockholders of the Western Union Co. are in no better position. Nor can any stockholder of that company champion the supposed rights of the stockholders of the Mutual Union Co., none of which has complained.
The points made by the plaintiff which have so far-been considered, fail to show want of power. They involve only matters of discretion affecting the price and questions-of policy. The discretion may have been unwisely, imprudently, or even recklessly, exercised, and the policy pursued may be questionable. But no court can dictate the-business policy to be pursued by a corporation, nor can a. court prevent a party capable of contracting from making-a bad bargain. Neither can an unprofitable bargain which in itself is not illegal or immoral, be set aside, when made, except upon proof of fraud or mistake of fact amounting-to at least a partial failure of consideration. There is no-pretense that any such element exists in this case, nor has-it been claimed that the directors of the Western Union Co. have any personal interest which conflicts with a proper and faithful discharge of their duties towards the stockholders.
Moreover, the defendants insist, and by affidavits have-shown that the lines of the Mutual Union Co. were ¡ needed for the more convenient and proper despatch of the *451 business of the Western Union Co.; that they were leased upon the best terms attainable, and that they may be reasonably expected to yield a profit. These are matters which can be determined only by the directors and a certain proportion of the stockholders of the Western Union Co. in the manner prescribed by law, and if they were so determined the law has been satisfied and individual stockholders who are dissatisfied, must submit.
The only remaining question, therefore, is whether the forms of law have been complied with.
The act of 1870 herein before referred to expressly provides that no purchase, sale, lease or conveyance by any telegraph company of this state authorized by said act, “ shall be valid until it shall have been ratified and approved by a three-fifths vote of its board of directors or trustees, and also by the consent thereto in writing, or by vote, at a general meeting, duly called for the purpose, of three-fifths in interest of the stockholders in such company, present or represented by proxy, at such meeting.”
That the lease was duly ratified and approved by a three-fifths vote of the board of directors of the Western Union Co. fully appears. Furthermore the defendants allege in their affidavits that three-fifths in interest of the stockholders consented thereto in writing. This the plaintiff claims was not a sufficient compliance with the Statute, inasmuch as the said consent was not given at a general meeting called for the purpose. This is a new point which was not involved in any of the preceding cases.
There can be no doubt that the grammatical construction of the last clause of the act of 1870 supports plaintiff’s claim, and this is so whether regard be, or be not, had to punctuation. In the quotation made by me above, the punctuation strictly corresponds with that of the original act on file in the office of the secretary of state. By that construction the alternative of writing or voting their assent is given to the stockholders, but that alternative is only to be exercised at a general meeting duly called for the pur *452 pose. No other construction than this can be given to it without a highly questionable transposition of words.
Now it may be, and on the part of the defendants it has been, argued with great plausibility, that the legislature must have meant to make the assent in writing equivalent to a vote at a meeting, because the deliberation with which a stockholder would sign the written instrument, no matter where, may well be deemed equivalent, if not superior, to that with which he would cast his vote at a meeting.
If it could be clearly ascertained that such was the intention of the legislature,' effect should be given to it. in spite of the language used, for according to the rules applicable to the interpretation of statutes the intention clearly dedncible prevails over the literal sense of the words used. But the same rules also demand that, in order to get at the intention, recourse must first be had to the words used. The intention of an act is not to be presumed, but is to be gathered from its language, and if that can be done, the policy of the enactment is not to be. regarded. And all the words are to be construed together, and effect is to be given to every one of them, if it can be done without reaching absurd conclusions. It matters not what the consequences may be. A court is not at liberty to.speculate on the intention of the legislature when the words are clear, or to construe an act according to its own notions of what ought to have been enacted. To give it a construction contrary to, or different from, that which the words import, is not to interpret law, but to make it.
In view of these rules which are well settled, the fallacy of the argument advanced by the defendants, however plausible it may appear from the start, becomes apparent, fo'r it is impossible to ascertain from the act as a whole, the intent contended for. On the contrary, it appears that, if in point of fact the legislature did so intend, it not . only failed to give proper expression to it, but also employed language which leads to a different conclusion. Moreover, the grammatical construction leads to no absurd conclusions and may even be supported by substantial reasons.
*453 It is a fundamental principle in the general law of corporations, in the absence of any specific enactment to the contrary in the charter, that all business requiring the assent of-stockholders must be transacted at a duly convened meeting of those constituting the body corporate, and the only legal concurrence of stockholders in measures upon which they are called upon to act, is to be expressed at such meeting, after full opportunity of discussion and debate, and full permission to those opposed to any measure favored by a majority, to attempt by persuasion to reverse the prevailing sentiment. As is said by Mr. Brice : “'More than this, they (the minority) can demand a fair hearing, and that their wishes and arguments should be listened to and duly weighed” (Green's Brice, p. 71). This being the general rule, and one of the most valuable privileges of the members of a corporation, it will never be assumed that the legislature intended to abolish the right except under stress of a clear and imperative enactment to that effect.
The terms and conditions upon which assent should be given to a scheme like the one under consideration, are pre-eminently matters for discussion and consideration by the stockholders at a general meeting duly called for that purpose, and such a meeting the statute contemplates.
The importance of the statutory requirement in the present case becomes still more apparent when the following circumstances are considered: The defendants say that three-fifths in interest of all the stockholders of the Western Union Co. on being privately appliéd to, consented in writing to the consummation of the lease. But they furnish no list and disclose no names. Now it so happens that for a considerable time prior thereto the transfer books were kept closed, but that nevertheless during that period transfers of vast numbers of shares of stock took place daily in Wall Street. This raises a necessity for scrutiny. It becomes important to be seen whether the alleged stockholders who signed the consent, were at the time actual bona fide stockholders. The most suitable occasion to determine *454 in the first instance who is, or is not, such a stockholder, is a meeting duly convened for the purpose on notice to all.
My first conclusion, therefore, is that the true interpretation of the statute corresponds with its grammatical construction, that the failure of the Western Union Co. to obtain the consent of the requisite number of its stockholders at a general meeting duly called for that purpose, constitutes a defect, but the only defect, in the proceedings taken for the acquirement of the lines of the Mutual Union Co. ; and that in consequence thereof the plaintiff, as an aggrieved stockholder in the Western Union Co., is entitled to have the injunction against the consummation of the lease and the payment of the consideration, or any part thereof, continued during the pendency of the action. Leave, however, should expressly be granted to the defendant, the Western Union Co., to convene a general meetring of its stockholders for the purpose of procuring the consent to the lease of the requisite number of stockholders in the manner required by the statute, and, in the event that such consent should be duly obtained, the order should further provide that thereupon, on due proof of such fact, any of the defendants may at any time thereafter apply for the dissolution of the injunction.
Let an order to the foregoing effect be presented for settlement on notice.